## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

YADIRA HURST,

      Plaintiff,

v.                                           No. CIV 19-0540 RB/SCY

ROBERT WILKIE, in his capacity as
SECRETARY OF VETERANS AFFAIRS,

      Defendant.

### MEMORANDUM OPINION AND ORDER

In 2016, Ms. Yadira Hurst began working as a janitor for Crystal Clear Maintenance, Inc. At that time, Crystal Clear had a contract with the Department of Veterans Affairs (VA) to provide janitorial services for the Santa Fe National Cemetery (SFNC), which is operated by the VA National Cemetery Administration (NCA). In 2018, the VA awarded the cleaning contract to RC Tech, Inc. RC Tech hired Ms. Hurst, and she continued to work as a janitor at the Cemetery.

Two SFNC employees sexually harassed Ms. Hurst in 2018. Shortly after she complained about the harassment to Jared Howard, the Director of SFNC, RC Tech placed her on administrative leave pending an investigation. Mr. Howard ultimately asked RC Tech to remove Ms. Hurst from her position at the Cemetery. Because RC Tech's sole client was the SFNC and it had no other work for Ms. Hurst, it terminated her employment.

Ms. Hurst filed suit against Robert Wilkie, in his capacity as Secretary of the VA, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2000e-17. Defendant moves for summary judgment, primarily arguing that the VA was not Ms. Hurst's "employer" and thus cannot be held liable under Title VII. Analyzing the facts under the "joint employer test," the Court

agrees that no reasonable jury could find that the VA was her employer. Consequently, the Court will grant Defendant's motion and dismiss the lawsuit.

## II.   Summary Judgment Standard of Review

Summary judgment is appropriate when the Court, viewing the record in the light most favorable to the nonmoving party, determines "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). A fact is "material" if it could influence the determination of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" if a reasonable trier of fact could return a verdict for either party. *Id*. The moving party bears the initial responsibility of "show[ing] that there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the moving party meets this burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)) (quotation marks omitted).

## II.   Factual and Procedural Background[1]

### A.   The Contracts

The SFNC, one of the National Cemeteries operated by the VA NCA, "honors Veterans with a final resting place and lasting memorials that commemorate their service to our nation." (*See* Docs. 54-A-1 at 6; 54-A-2 at 4; *see also* Doc. 59 at 8.) The VA contracts with outside vendors

---

[1] The Court recites all admissible facts in a light most favorable to Ms. Hurst. Fed. R. Civ. P. 56; *see also Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). The Court recites only that portion of the factual history relevant to this motion.

(referred to as Contractors) to provide janitorial services for the SFNC "Administration Building and its immediate surroundings." (*See* Doc. 54-A-2 at 4–5.) Crystal Clear and RC Tech were two of these Contractors. (*See* Doc. 54-A ¶ 5.) Crystal Clear provided janitorial services for the SFNC from 2013 through May 31, 2018. (*See id.* ¶ 4; 54-A-1.) The VA awarded RC Tech the cleaning contract effective June 1, 2018. (Docs. 54-A ¶ 5; 54-A-2.)

The contracts provide that the Contractor is responsible for providing all labor, materials, tools, and equipment for the services provided to the SFNC. (Docs. 54-1-A at 6; 54-A-2 at 2.) The Contractor must "plan, coordinate, manage, and perform the activities of '[the] services' described" in the Contract. (Docs. 54-A-1 at 5; 54-A-2 at 4.) The contracts define the services to be provided; for example, they specify the areas to clean and the frequency of cleaning duties. (Docs. 54-A-1 at 7–9; 54-A-2 at 6–10.) The contracts set the days and hours that the NCA expects Contractors to provide services. (Docs. 54-A-1 at 7; 54-A-2 at 6.)

Contractors are responsible for the training and safety of employees and for inspecting employees' work. (Docs. 54-A-1 at 11–12; 54-A-2 at 12–13.) The contracts define "Standards of Employee Conduct," which require Contractor personnel to adhere to a dress and conduct code "[d]ue to the sensitive mission of the Cemetery . . . ." (Docs. 54-A-1 at 10; 54-A-2 at 10.) Regarding discipline and termination, the contracts provide:

> The Contractor shall be responsible for maintaining satisfactory standards of personnel conduct and work performance and shall administer disciplinary action as required. The Contractor is expected to remove any employees from the Cemetery for cause, to include, but not limited to, safety violations, other misconduct in performance of duty under these specifications and/or conduct contrary to the best interests of the Government. If the Contractor fails to act in this regard, or the reason for a removal is immediately required to protect the interests of the Government, the [VA's Contracting Officer's Representative (COR)] may direct the removal of an employee from the premises. Contractor objections to any such action will be referred to the Cont[r]acting Officer (CO) for final resolution; however, the Contractor will first immediately comply with COR direction pending any CO final resolution at a later time or date. The Contractor will not be due any

type of compensation for their costs incurred as a result of an employee being removed for cause; unless the removal is directed by the COR, and is later found invalid and/or unreasonable by the Contracting Officer.

(Docs. 54-A-1 at 11; 54-A-2 at 13.) The COR is responsible for inspecting "and evaluat[ing] the Contractor's performance to ensure services are received in accordance with [Contract requirements . . . ." (Docs. 54-A-1 at 12; 54-A-2 at 14; *see also* Doc. 59-2 at 4 (describing COR's responsibilities).) After the services are accepted, the Contractors are paid based on a rate fixed in the contracts. (*See* Docs. 54-A-1 at 2–4; 54-A-2 at 2–4.)

Contractors pay their personnel directly, provide W-2 forms, and withhold taxes. (Doc. 54-A ¶ 9.) The VA does not maintain any employment records, such as payroll, taxes, or insurance, for Contractor personnel including Ms. Hurst. (*Id.* ¶ 11; *see also* Doc. 54-B at 149:8–15.) The contracts require that Contractors pay personnel the federal minimum wage in conformance with the McNamara-O'Hara Service Contract Act ("Service Contract Act"), 41 U.S.C. §§ 6701–07; Contractors are otherwise free to pay a higher wage. (Docs. 54-A-1 at 14–16; 54-A-2 at 15–16.) The RC Tech contract contained provisions required by two Executive Orders (EOs). Under EO 13706, federal contractors must provide personnel with a specified minimum amount of paid sick leave, vacation days, and holidays; RC Tech are free to offer additional benefits. (Doc. 59-2 at 18.) Under EO 13495, all federal service contracts were required to include a clause directing Contractors to offer certain employees "employed under [a] predecessor contract whose employment [would] be terminated as a result of the award of the successor contract, a right of first refusal of employment . . . ." *See* Nondisplacement of Qualified Workers Under Service Contracts, 74 FR 6103, 6103 (Jan. 30, 2009), *revoked by* EO 13897 (Oct. 31, 2019).

## B.    Ms. Hurst's Employment

Crystal Clear hired Ms. Hurst to clean at the SFNC pursuant to Crystal Clear's contract

4

with the VA. (*See* Doc. 54-B at 25:20–25.) Ms. Hurst's supervisor at Crystal Clear was Douglas Craft. (*Id.* at 15:15–19, 155:9–13; Doc. 54-A-1 at 1.) Crystal Clear provided Ms. Hurst job-specific training. (Doc. 54-B at 52:9–11.)

After RC Tech won the cleaning contract in 2018, Mr. Howard forwarded Ms. Hurst's contact information to RC Tech in compliance with EO 13495. (Doc. 54-A ¶ 7.) Ms. Hurst provided her resume to RC Tech in May 2018 and met with one of RC Tech's representatives[2] for an interview. (Doc. 54-B at 22:12–22.) RC Tech offered Ms. Hurst employment as janitor for the SFNC. (*See* Doc. 59-6; *see also* Doc. 54-B at 29:19–22.) The offer was contingent on the submission of a negative drug test, a favorable background check, and successful completion of a 90-day probation period. (Doc. 59-6.)

Robert Childers, who owns RC Tech, lives in Florida. (Doc. 54-B at 20:21–21:3, 23:14–17.) As a result, he did not direct Ms. Hurst's daily cleaning responsibilities. (*See id.* at 23:17–18.) Ms. Hurst testified that because she was performing the same position for RC Tech that she had with Crystal Clear, she "was already well-trained." (*Id.* at 49:3–6.) SFNC staff would occasionally direct her to perform her duties in a certain order or ask her to perform tasks that were not regularly part of her duties. (*See id.* at 33:5–15, 34:23–35:10, 119:21–120:15.) Ms. Hurst testified that she reported to Mr. Howard, let him know if she needed anything, and considered him to be her supervisor. (*Id.* at 23:14–21.)

Pursuant to the contract, Ms. Hurst wore an RC Tech uniform at work, supplied by RC Tech. (Docs. 54-B at 146:10–12, 157:7–14; 54-A-2 at 10.) RC Tech paid her wages, withheld

---

[2] Mr. Childers hired Native Resources to manage the RC Tech cleaning contract. (*See* Doc. 54-B at 27:1–18.) Ms. Hurst interviewed with Benjamin Bueneman, a Native Resources employee. (*See id.* at 22:14–22; *see also* Doc. 59-4 at 39:9–16.) Mr. Bueneman taught Ms. Hurst how to record her work hours and was her point of contact if she needed cleaning supplies or a schedule change. (Doc. 59-4 at 27:1–13, 38:15–39:8, 156:4–7.) He was also involved in her report of harassment. (*See, e.g.*, *id.* at 129:22–130:2.)

taxes, and was listed as her employer on her W-2 form. (*See* Doc. 54-B at 148:2–16.) She obtained

necessary supplies from RC Tech. (*Id.* at 147:15–19.)

      **C.**     **Ms. Hurst's Harassment Complaints and Termination**

Ms. Hurst was sexually harassed by two VA employees. The first incident occurred on

March 30, 2018, when Ramon C'de Baca sent Ms. Baca an unsolicited explicit picture via text

message. (*See* Docs. 54-B at 116:12–118:6.) Mr. C'de Baca was the VA Administrative Officer

and "the second highest-ranking VA employee" at SFNC. (Doc. 54-A ¶ 13.) Fearing retaliation,

Ms. Hurst did not inform anyone with RC Tech or the VA about this harassment. (*See* Doc. 54-B

at 121:23–122:15.)

Ms. Hurst was also harassed by Ray Baca, a caretaker at SFNC. (*See id.* ¶ 14; Doc. 54-B

at 74:2–16.) Mr. Baca began harassing Ms. Hurst in March 2018 when he asked Ms. Hurst for

sexual favors; she declined. (*See* Doc. 54-B at 74:2–16.) Ms. Hurst did not immediately report this

harassment to Crystal Clear or the VA. (*See id.* at 80:24–81:8.) In July and August 2018, Mr. Baca

sent Ms. Hurst several sexually suggestive messages via Facebook. (*See id.* at 82:19–83:1, 84:24–

25; *see also* Doc. 54-C.) Ms. Hurst did not report this harassment to RC Tech or the VA. (*See* Doc.

54-B at 65:24–66:9.)

On August 20, 2018, Mr. Baca blocked Ms. Hurst in a doorway at the SFNC and refused

to move unless she hugged him. (*See id.* at 94:7–95:3.) She refused and noticed that Mr. Howard

was watching the interaction. (*Id.* at 95:4–9; *see also* Doc. 54-A ¶ 16.) Ms. Hurst tried to push past

Mr. Baca and told him that if he did not move, she would tell Mr. Howard. (Doc. 54-B at 95:11–

17.) Mr. Baca left. (*Id.* at 95:17.) Ms. Hurst met with Mr. Howard and Mr. C'de Baca later that

day and told them about the incident. (*Id.* at 102:3–12.) Mr. Howard asked if there had been any

other incidents. (*Id.* at 102:12–13.) Ms. Hurst stated that she had informed Mr. Baca she "wasn't

interested some time back[, and he had] stopped bothering [her]." (*Id.* at 102:12–16.) Ms. Hurst testified that Mr. Howard asked her: "What would you like me to do? Would you like to file a report, or can you let me handle this?" (*Id.* at 102:20–22.) She replied that if he could handle it, then there was no need to file a report.[3] (*Id.* at 102:23–24.) Mr. Howard directed Ms. Hurst not to take her breaks with VA staff.[4] (*See* Docs. 54-A ¶ 17; 54-B 115:3–9.)

Ms. Hurst informed RC Tech about Mr. Baca's harassing conduct. (*See* Docs. 54-A ¶ 18; 54-B 129:22–130:12, 133:10–22.) On September 6, 2018, RC Tech placed Ms. Hurst on paid administrative leave pending an investigation and asked her to submit a formal statement. (*See* Docs. 54-A-3; 54-B at 133:10–22.) Ms. Hurst drafted a "Statement Regarding Misconduct" and sent it to RC Tech. (*See* Doc. 54-A-4.) RC Tech forwarded Ms. Hurst's statement to Mr. Howard on September 7, 2018. (Doc. 54-A ¶ 21.)

There is evidence that while investigating Ms. Hurst's claim, Mr. Howard asked his staff to provide him with "dirt" on Ms. Hurst. (See Doc. 59-19 ¶ 3.) He did not interview Ms. Hurst about any allegations his employees made. (*See* Doc. 59-5 at 39:19–21.) Mr. Howard later asked RC Tech to remove Ms. Hurst from her work at SFNC. (*See, e.g.*, Doc. 54-A-5 at 1.) Mr. Childers responded to Mr. Howard, copying Joseph Mendoza, VA's Contracting Officer, on the email and stated: "Pursuant to your request to remove Ms. Yadira Hurst from [the RC Tech cleaning contract, w]e request a written notice justifying removal from the contract." (*Id.*; *see also* Doc. 54-A ¶ 2.) Mr. Howard responded on September 18, 2018, and attached a letter outlining his reasons. (Doc. 54-A-5 at 2.) The letter, which shows edits made by Mr. Mendoza, reads:

---

[3] The parties dispute what process Mr. Howard was required to follow with respect to investigating the reported harassment. (*See, e.g.*, Docs. 59 at 6 (discussing a purported VA policy); 62 at 3 (objecting to the policy as unauthenticated).) This dispute is not material to the Court's decision.

[4] The parties dispute whether Mr. Howard directed Ms. Hurst not to take breaks with male staff or all staff. (*See, e.g.*, Doc. 54-A-4; 54-A-5 at 2.) This dispute is not material to the Court's decision.

Robert Childers,

During my investigation into complaints made by Ms. Hurst, I have discovered her conduct to be unprofessional and unacceptable. This finding was substantiated from several statements made to me by my staff.

I am requesting Ms. Yadira Hurst be removed from working at Santa Fe National Cemetery for the following reasons:

- Several employees have complained or commented about several lewd conversations by Ms. Hurst. For example, she has approached them to discuss with not limited to but including her desire for a "threesome" for her boyfriend's birthday and she commented on how, discussing human feces in reference to the bathroom looks like someone had tacos last night, etc.
- Several employees, including myself, have witnessed in the past week Ms. Hurst have loud profanity laced conversations in the administrative building via telephone.
- Writing a sworn statement that falsely accuses the management team of disparaging activity.
- Failure to maintain a professional work environment i.e. dating employees and members of the honor guard team.
- Failing to stop having contact with staff on cemetery grounds when instructed by the management team.
- Giving and soliciting of personal phone numbers with employees and honor guard team.
- Leaving business cards with lipstick prints in the Directors office.

Other than the above, Although Ms. Hurst's job performance was satisfactory. Unfortunately, her conduct has been unprofessional and is inconsistent with an appropriate has created a hostile work environment at Santa Fe National Cemetery.

(*See id.*; Doc. 54-A ¶ 24.) As a result of this request, and because RC Tech had no other work for Ms. Hurst to perform, RC Tech terminated her employment. (*See* Doc. 54-B at 135:1–18.)

On January 11, 2019, Ms. Hurst filed a Complaint of Employment Discrimination with the VA Office of Resolution Management (ORM) alleging sexual harassment by Mr. Baca and retaliatory discharge. (*See* Docs. 54-D ¶ 5; 54-D-2.) The VA ORM dismissed the complaint on the basis that Ms. Hurst lacked standing, as she was not a VA employee. (*See* Doc. 54-D-3 at 2–3.) Ms. Hurst filed her Complaint against the VA on June 12, 2019, bringing claims for sexual harassment and retaliation under Title VII. (Doc. 1; *see also* Doc. 4.) Defendant now moves for summary judgment. (Doc. 54.)

**III.   Analysis**

To succeed on her claims under Title VII, Ms. Hurst must first prove that the VA was her

8

employer. *See Knitter v. Corvias Mil. Living, LLC*, 758 F.3d 1214, 1225 (10th Cir. 2014). If she cannot show that the VA was her employer, her claims will fail. *See id.* Depending on the circumstances of the case, the Tenth Circuit directs courts to "choose[] among three different tests to determine whether a defendant  is an employer  . . . : (i) the hybrid test; (ii) the joint employer test; and (iii) the single employer test." *Id.* at 1225–26 (citing *Bristol v. Bd. of Cty. Comm'rs of Cty. of Clear Creek*, 312 F.3d 1213, 1217–18 (10th Cir. 2002)). The parties agree that the Court should analyze the matter using the joint employer test, as Ms. Hurst asserts that both the VA and RC Tech were her employers. (*See* Docs. 54 at 10; 59 at 16.)

"Under the joint employer test, two entities are considered joint employers if they 'share or co-determine those matters governing the essential terms and conditions of employment.'" *Knitter*, 758 F.3d at 1226 (quoting *Bristol*, 312 F.3d at 1218). Courts consider a variety of factors under this test, the most important of which is the right to terminate the employment relationship. *See id.* Other factors include: (1) "the ability to promulgate work rules and assignments"; (2) the ability to "set conditions of employment, including compensation, benefits, and hours"; (3) "day-to-day supervision of employees, including employee discipline"; and (4) "control of employee records, including payroll, insurance, taxes and the like." *Id.* (quotation marks and quotation omitted). Applying the joint employer test to the facts here in a light most favorable to Ms. Hurst, the Court finds that no reasonable jury could find that the VA was her joint employer.

### A.    Authority to Hire or Terminate

The Tenth Circuit has repeatedly noted that the most important factor in determining "control over the terms and conditions of an employment relationship is the right to terminate it under certain circumstances . . . ." *Id.* at 1228 (quoting *Bristol*, 312 F.3d at 1219); citing *Sandoval v. City of Boulder*, 388 F.3d 1312, 1324 (10th Cir. 2004)). It has also considered "whether the

alleged joint employer had impact on the hiring decision . . . .” *Banks v. St. Francis Health Ctr., Inc.*, No. 15-CV-2602-JAR, 2016 WL 6905581, at *13 (D. Kan. Nov. 21, 2016) (citing *Sandoval*, 388 F.3d at 1324).

### 1. Power to Terminate

Ms. Hurst argues that the contract “expressly set out procedures for the ‘removal for cause’ of RC Tech employees” and “divided responsibility” for removing employees between the VA and RC Tech. (Doc. 59 at 18 (emphasis omitted).) She relies on the following contract language:

> The Contractor is expected to remove any employees from the Cemetery for cause . . . . If the Contractor fails to act in this regard, or the reason for a removal is immediately required to protect the interests of the Government, the [VA’s Contracting Officer’s Representative (COR)] may direct the removal of an employee from the premises. Contractor objections to any such action will be referred to the Cont[r]acting Officer (CO) for final resolution . . . . The Contractor will not be due any type of compensation for their costs incurred as a result of an employee being removed for cause; unless the removal is directed by the COR, and is later found invalid and/or unreasonable by the Contracting Officer.

(*Id.* at 19 (quoting Doc. 54-A-2 at 11).) Ms. Hurst asserts that this language gives the VA authority, under certain circumstances, to remove an employee “from the contract itself.” (*Id.* at 20 (citation and emphasis omitted).)

Defendant argues that removal of an RC Tech employee from their position at the Cemetery “is not tantamount to the power to terminate that person.” (Doc. 54 at 11.) Defendant relies on *Knitter*. (*Id.*) In *Knitter*, the plaintiff worked for LGC, a contracting company that provided handyman services. 758 F.3d at 1217, 1219. Almost all of LGC’s revenue came from Picerne, a property management company that managed housing on military bases. *Id.* at 1219. LGC employed the plaintiff, and she performed her work exclusively at Picerne-managed properties. *Id.* at 1217. The LGC-Picerne contract did not give Picerne “power to fire Ms. Knitter; it at most could request that LGC no longer assign Ms. Knitter to work at [the military base].” *Id.*

10

at 1229. When Picerne made such a request, the plaintiff argued that it "effectively forced [LGC] to terminate her employment" because "almost all of LGC's business came from Picerne." *Id.* The Tenth Circuit held that because Picerne had no power over the plaintiff's "continued LGC employment or her ability to work for other LGC clients[,] . . . the ability to terminate her employment [] lay solely with LGC." *Id.*; *see also Tenorio v. San Miguel Cty. Det. Ctr.*, No. 1:15-CV-00349-LF-JHR, 2018 WL 3611055, at *8 (D.N.M. July 27, 2018) (finding that the County did not have the right to terminate an employee employed by a contractor even though the County had "absolute authority to deny [the employee] access to the facility").

Similarly, here, the VA had the authority to remove Ms. Hurst from the premises as well as from the contract "for cause" if RC Tech failed to do so. (*See* Doc. 54-A-2 at 13.) But as in *Knitter*, the VA had no authority to completely terminate Ms. Hurst's employment with RC Tech. Ms. Hurst makes no effort to distinguish these circumstances from those in *Knitter*, nor does she cite any authority in support of her position. (*See* Doc. 59 at 18–21.) The Court finds there is no genuine dispute that RC Tech alone had the power to terminate Ms. Hurst's employment.

### 2.      Power to Hire

Ms. Hurst asserts that under EO 13495, "the VA and RC Tech had a contractual agreement to hire [her] after it took over the contract from Crystal Clear Maintenance . . . ." (Doc. 59 at 18 (emphasis omitted).) She argues that the cleaning contract "governed Ms. Hurst's hiring by requiring RC Tech to hire [her] if she chose to exercise her right of first refusal." (*Id.*) Thus, she concludes, "a jury could find that RC Tech and [the VA] shared responsibility for the terms of [her] hiring." (*Id.*) Ms. Hurst's reasoning is unpersuasive.

First, the Court examines the actual hiring process. Mr. Howard's role in the hiring process ended once he forwarded Ms. Hurst's information to RC Tech. Thereafter, Ms. Hurst submitted

her resume to and interviewed with Mr. Bueneman, an RC Tech representative. RC Tech—not the VA—extended an offer of employment, but it was contingent on terms dictated by RC Tech (the drug test, background check, and probationary period). (*See* Doc. 59-23.) This process shows that RC Tech maintained the dominant role in hiring Ms. Hurst.

More importantly, the Court finds that EO 13495 should not be applied to transform the VA into a joint employer.  The right of first refusal requirement was not an obligation imposed on RC Tech by the VA, but by EO 13495. Thus, Ms. Hurst fails to show that *the VA* "had any say in the hiring process."[5] *See Banks*, 2016 WL 6905581. The VA's hands were as tied as RC Tech's in this regard. Further, the Court agrees with Defendant that EO 13495 did not impose an absolute obligation on RC Tech to hire anyone. (*See* Doc. 62 at 2, 16.) EO 13495 specifies that it did not extend to "any employee 'whom the contractor . . . reasonably believe[d], based on the particular employee's past performance, ha[d] failed to perform suitably on the job.'" (*Id.* at 2 (quoting EO 13495 § 4(b), 74 FR at 6104).) *See also Adams & Assocs., Inc.*, 363 NLRB No. 193 (May 17, 2016), *review denied*, 871 F.3d 358 (5th Cir. 2017) (noting that although a successor contractor "was required to offer unit employees a right of first refusal under the EO and [Department of Labor (DOL)] regulations, this right of first refusal did not constitute a mandated blanket offer to all employees"). Finally, Defendant asserts that "if a right of first refusal were sufficient to create an employment relationship with the client, then a service employee who is not an employee under the first contract would become an employee under the second contract, even where the contracts are identical." (Doc. 62 at 16.) The Court agrees that this would produce an absurd result. In sum, the Court finds that EO 13495 did not give the VA power to dictate who RC Tech hired.

---

[5] This conclusion is supported by the fact that an aggrieved employee had the ability to enforce the "right of first refusal" against the successor contractor—not against the federal agency—by filing a complaint with the Department of Labor. *See* 29 C.F.R. § 9.21, 2020 WL 496822 (Jan. 31, 2020), *rescinded by* 85 FR 5567-01.

### B.      Authority to Supervise and Discipline

The Court next "look[s] to [the VA's] day-to-day supervision of employees, including employee discipline." *See Knitter*, 758 F.3d at 1229–30 (quotation marks and quotation omitted).

### 1.      Supervision

Defendant asserts that while the cleaning contract detailed RC Tech's work responsibilities, the VA "did not supervise or manage how the Contractor completed the work beyond evaluations of overall contract performance." (Doc. 54 at 14.) Defendant again relies on *Knitter*. (*Id.*) In *Knitter*, "Picerne managers supervised the [plaintiff's] daily work to the extent they provided instruction on how to perform certain tasks and notified the [plaintiff] if [her] work did not meet Picerne's standards." 758 F.3d at 1230. Specifically, Picerne supervisors supervised in the following ways: (1) "[they] occasionally showed the [plaintiff] how they wanted specific tasks performed"; (2) "[they] conducted walk-throughs" after the plaintiff finished "to ensure all work had been properly completed"; and (3) they contacted either the LGC owner or the plaintiff if she "had not completed her work satisfactorily . . . ." *Id.* at 1221. The supervision did not, however, "extend to such matters as training or formal performance evaluations provided to employees . . . ." *Id.* The "supervision was limited to directing the [plaintiff] on how to perform certain tasks to its satisfaction, much like an individual hiring a moving company to move his or her belongings into an apartment might direct the movers on where to place items or how to protect items that are particularly fragile." *Id.*

Ms. Hurst fails to distinguish *Knitter*. (*See* Doc. 59 at 23.) Instead, she emphasizes the fact that Mr. Howard and other VA personnel directed her daily duties, occasionally directing her to perform a task that was outside her normal responsibilities. (*Id.* at 21–23.) She maintains that RC Tech did not supervise her duties because Mr. Childers lived in Florida. But as in *Knitter*, the

contract here provided that RC Tech "was responsible for inspecting its employees' work" and for the "safety and training of its employees." (*Id.*) Ms. Hurst acknowledged that she was initially trained by Crystal Clear, and was well-trained in her position by the time she began working for RC Tech.

Ultimately, Ms. Hurst's argument, unsupported by any authority, fails to hit the mark. *Knitter* is sufficiently analogous and controls the outcome here: no reasonable jury could find that the VA's daily supervision of Ms. Hurst would elevate its status to joint employer. As the Tenth Circuit found in *Knitter*, "the level of supervision [exercised by the VA] was consistent with a client-vendor relationship, not an employer-employee relationship." *See id.* at 1230.

### 2.    Discipline

Defendant submits that the cleaning contract made RC Tech "responsible for maintaining satisfactory standards of personnel conduct and work performance and [for] administer[ing] disciplinary action as required . . . ." (Doc. 54 at 16 (quoting Doc. 54-A-2 at 13).) Again, Defendant compares the facts here to those in *Knitter*, where Picerne had the authority to fine contractor employees who did not wear required safety equipment. (*Id.* (discussing *Knitter*, 758 F.3d at 1221).) Despite the ability to levy fines, the Tenth Circuit found that Picerne's minimal ability to discipline LGC employees "did not suffice to render it a joint employer . . . for Title VII purposes." 758 F.3d at 1231; *see also Crumpley v. Associated Wholesale Grocers*, 2018 WL 1933743, at *37 (D. Kan. Apr. 24, 2018) (finding that where a client verbally disciplined a contractor's employee for concerns about leaving an assigned area, no reasonable jury could find that the client's "minimal disciplinary role goes beyond a client-vendor relationship") (citation omitted).

Again, Ms. Hurst does not attempt to distinguish the facts here from *Knitter* or the other authority Defendant cited in support. (*See* Doc. 59 at 18–19.) Rather, her response regarding the

VA's ability to discipline her is embedded within her argument on the VA's authority to terminate her employment. (*See* Doc. 59 at 18–19.) She advances no other reasoning or authority to support a finding that the VA had authority to discipline her beyond what she argued previously with respect to removal of RC Tech employees for cause.[6] (*See id.*) The Court finds that no reasonable jury could find that the VA's minimal authority to discipline Ms. Hurst is not consistent with an employer-employee relationship.

### C.      Compensation, Benefits, Hours, and Records

Ms. Hurst urges the Court to find that the VA, and not RC Tech, controlled many aspects of her employment, such as her wages, benefits, and hours. (*See* Doc. 59 at 22.)

#### 1.      Compensation and Benefits

Ms. Hurst argues that the VA was her joint employer because the contract governed several terms of her employment, including those "governing [her] wages, holiday, personal leave . . . , and sick leave. (*See* Doc. 59 at 17 (citations omitted).) Defendant contends that, like the right of first refusal, these contractual terms were required by federal law—the Service Contract Act and EO 13706. (Doc. 62 at 15.) "The [Service Contract] Act requires the payment of minimum wage and fringe benefits to employees working under contracts providing services to the United States." *Am. Waste Removal Co. v. Donovan*, 748 F.2d 1406, 1407 (10th Cir. 1984); *see also* EO 13706, Establishing Paid Sick Leave for Federal Contractors, 80 FR 54697 (Sept. 7, 2015). Thus, as with EO 13495, these contractual requirements regarding Ms. Hurst's minimum wage and fringe benefits were not obligations imposed by the VA, but by EO 13706 and the Service Contract Act. *See id.*; *see also Menocal v. GEO Grp., Inc.*, 113 F. Supp. 3d 1125, 1133 (D. Colo. 2015). These

---

[6] Defendant argued that Mr. Howard's direction to Ms. Hurst to not take her break with VA employees "was not disciplinary or punitive in nature." (Doc. 54 at 15.) As Ms. Hurst did not respond to this point (*see* Doc. 59 at 16–23), the Court need not consider it.

requirements are not sufficient to elevate the VA's status to that of an employer.

### 2. Hours and Records

Ms. Hurst states that the VA set her work schedule. (*See* Doc. 59 at 21.) She does not cite authority to show that this power is enough, on its own, to establish that the VA is an employer. Rather, the Court finds that, much like the VA's limited power to supervise her activities, its power to set hours for its Contractors to complete their work is more in line with a vendor-client relationship than an employer-employee relationship.

It is undisputed that the VA did not maintain any employment records, such as payroll, taxes, or insurance, for Ms. Hurst. Thus, this factor weighs against finding that the VA was Ms. Hurst's employer.

### D. Conclusion

Ms. Hurst fails to come forward with evidence or authority to show that the VA "share[d] or co-determine[d] those matters governing the essential terms and conditions of employment. *Knitter*, 758 F.3d at 1226 (quotation omitted). On weighing the factors under the joint employer test, the Court determines that no reasonable jury could find that the VA was Ms. Hurst's joint employer. Consequently, the Court need not reach the merits of her Title VII claims.

**THEREFORE,**

**IT IS ORDERED** that Defendant's Motion for Summary Judgment and Supporting Memorandum (Doc. 54) is **GRANTED**;

**IT IS FURTHER ORDERED** that this lawsuit is **DISMISSED with prejudice**.

_____
ROBERT C. BRACK
SENIOR U.S. DISTRICT JUDGE

16